Arnold L. Fein, J.
Plaintiff, Bunge Corporation (Bunge), sues to recover the face amount of three cashier’s checks issued by defendant, Manufacturers Hanover Trust Company (Manufacturers), payable to plaintiff, totalling $3,040,386.60, plus interest. The complaint pleads separate causes, of action in contract, and in conversion, on each check.
*831 Bunge, for a number of years prior to and during 1963, had continuous business dealings with Allied Crude Vegetable Oil Refining Corp. (Allied), not a party to this action and now a bankrupt as a by-product of the infamous salad oil swindle. Both were engaged in various aspects of the vegetable oil business. A substantial portion of their transactions involved the sale or transfer by one to the other of negotiable bills of lading, field warehouse receipts and registered warehouse receipts covering cottonseed oil and soybean oil. The underlying transactions here involved registered warehouse receipts.
A registered warehouse receipt represents 60,000 pounds of cottonsed oil stored in bonded warehouses, approved and registered by the New York Produce Exchange, or of soybean oil stored in bonded warehouses, approved and registered by the Chicago Board of Trade. Such receipts are negotiated by due indorsement and are regularly traded on both exchanges. Each represents a guarantee of delivery of the oil covered by the receipt.
On many of the sales or transfers from Bunge to Allied, payment was by ordinary check of Allied. Deposit of some of these Allied checks was delayed, by prearrangement, as a form of financing Allied. In some instances Allied paid interest to Bunge for such financing. However, some time in August, 1963, Bunge informed Allied that, in the future, certified checks drawn on a “first class New York City Bank” would be required from Allied on its purchase of registered warehouse receipts from Bunge. Allied proposed instead, and Bunge agreed, that payment by cashier’s checks of a “ first class New York City Bank ” would suffice.
Allied maintained an account in the First National Bank of North Bergen, New Jersey (Bergen), not a party to this action. For some three years prior to the transactions in suit, Bergen had an agreement with defendant, Manufacturers, under which Manufacturers’ 40 Wall Street Branch agreed “ to accept” from Allied instruments payable to Allied and its affiliates and to deposit them for the 11 account or credit ’ ’ of Bergen with Manufacturers, for the Allied “ account ” with Bergen, as though indorsed by Bergen as “ general endorser ”. Allied had no account with Manufacturers. Bergen authorized Manufacturers to indorse the instruments on behalf of Bergen and agreed to indemnify Manufacturers in connection with their arrangement. Allied’s messengers came to Manufacturers’ office with such instruments for deposit, on a daily basis. As agreed, the instruments were deposited in Bergen’s account *832 with Manufacturers. Allied’s messengers became well known to Manufacturers’ branch officers, who were in daily contact with Bergen’s assistant cashier, Puglisi, over the telephone.
Beginning some time in October, 1963, Puglisi, on behalf of Bergen, requested Manufacturers’ branch officers to issue Maufacturers’ cashier’s checks payable to Bunge, to be charged against Bergen’s account with Manufacturers, and to'be given to Allied’s messengers for delivery to Bunge. This arrangement was apparently designed to carry out the agreement between Bunge and Allied requiring Allied to pay by cashier’s checks. Puglisi’s further instructions were that, if the Allied messenger brought any such checks back to Manufacturers, they were to be accepted, canceled, and credited to Bergen’s account. Between October 17, 1963 and November 13, 1963, 12 such checks, totaling in excess of $17,000,000, were so issued and returned, including the three checks subject of this action. So far as Manufacturers was concerned, the checks were issued and their return accepted upon authorization by Bergen as to each check.
Accordingly, on November 1, 1963, Manufacturers, upon the request of Puglisi, drew two cashier’s checks payable to Bunge, one in the sum of $1,149,964.80, the other in the sum of $1,289,-221.80, and delivered them to Thomas Clarkin (Clarkin), an' Allied messenger, who called for them at defendant’s office. Clarkin took the checks to the Bunge office and delivered them to Karl Groeneveld (Groeneveld), an assistant treasurer of Bunge, in payment for 316 New York Produce Exchange registered warehouse receipts for cottonseed oil, then and there delivered by Groeneveld to Clarkin, duly indorsed by Groeneveld and another officer on behalf of Bunge, in accordance with an agreement for such sale made that day between Bunge and Allied. Groeneveld turned the two cashier’s checks over to James Caterina (Caterina), a cashier in the employ of Bunge, with instructions to deposit them in Bunge’s appropriate bank account.
Shortly thereafter, on the same day, Clarkin returned the two checks to the Manufacturers’ branch officer without comment. The checks were not indorsed by Bunge. Manufacturers’ officer, without further inquiry, caused each check to be marked and affixed with a notation: ‘ ‘ This check was requested by First National Bank of North Bergen, North Bergen, New Jersey, account #144-7-15849, and not used. Their account was credited today to offset the charge”. “Paid”. Bergen’s account was then credited therewith to reverse the prior charge against its account, and Puglisi was so advised.
*833 On November 13, 1963, in a similar transaction, Manufacturers issued a cashier’s check in the sum of $601,200, payable to Bunge, which was on that day picked up by Clarkin and by him taken to Bunge’s office and there delivered to Groeneveld’s assistant, Chester Polakowski (Polakowski), in payment for 100 Chicago Board of Trade registered warehouse receipts for soybean oil, duly indorsed by Groeneveld and another officer on behalf of Bunge to Allied, which were then and there delivered to Clarkin in return for the check, in accordance with an agreement for such sale made on that day between Bunge and Allied. Polakowski turned the check over to Caterina for deposit.
As with the November 1st transaction, shortly thereafter, on the same day, the Allied messenger returned the check to Manufacturers, unindorsed by Bunge. Manufacturers accepted the unindorsed check and marked it, ‘ ‘ not used for purpose drawn ”. Defendant then made credit and debit entries similar to those made on November 1, 1963.
The nine other checks in various amounts, dated respectively October 17,1963, October 18, 1963, October 21, 1963, October 23, 1963 (two checks), October 25, 1963, October 30, 1963 (two checks), November 4, 1963, subject of another action in this court, were similarly handled. Manufacturers did not follow a uniform procedure in recording its disposition of the various cashier’s checks when the Allied messenger returned them. It also obtained subsequent written confirmation of its procedure from Bergen with respect to some of them. These variances are not controlling, although they are indicative of Manufacturers’ concern as to the nature of the transactions and its records with respect thereto.
Contrary to defendant’s contention, plaintiff clearly proved delivery of the checks to Bunge. The testimony was completely credible and consistent with and buttressed by other evidence. The conversations between Bunge and Allied personnel arranging each transaction took place on the very day each check was issued by Manufacturers and returned to it. The sales prices coincided with the amounts of the checks. Manufacturers drew the checks in the amount stated payable to Bunge at the instructions of Puglisi, on behalf of Bergen, given on the same day. Puglisi could only have received advice as to the payee and the appropriate amounts from Allied. If, as defendant argues, there was no intention ever to deliver the chécks to Bunge, the communications between Puglisi and defendant and the issuance of the checks and their delivery to Allied’s messenger, all on *834 the same day, would be a series of meaningless charades without purpose or basis in reason or fact. Throughout the extensive trial, defendant made no real effort to demonstrate that the agreements were not made on the days in question for these specific transactions in such form.
Manufacturers adds nothing by its argument that, although the transactions took the form of sales, they were in reality a means of financing Allied, because of an alleged agreement between Allied and Bunge that Bunge would repurchase the warehouse receipts from Allied, upon Allied’s request. Even if proved, and it was not, this would be immaterial. Delivery of the checks to Bunge in exchange for the warehouse receipts amounted to a transfer of title to the checks to Bunge irrespective of any intention of Bunge or Allied or both that the transaction might or would be reversed at some future time. Since the checks were cashier’s checks, there would obviously be no benefit to either Allied or Bunge if they were withheld from deposit. Moreover, even if it could be found that the entire arrangement was a means of financing Allied, Bunge’s right to possession of the checks would not be affected.
Plaintiff’s evidence with respect to the means by which Allied’s messenger, Clarkin, came into the possession of the checks after he delivered them to G-roeneveld, and the role of Bunge’s cashier, Oaterina, and his actions with respect to the checks, was received over objection, and subject to a motion to strike. Because the serious evidentiary problems and the bizarre circumstances of the entire ease appear to present problems of novel impression, it is appropriate to discuss the rights of the parties under the applicable legal principles before considering the admissibility and impact of such evidence.
Plaintiff’s proof of delivery and payment of consideration established its title and right to possession, sufficient to sustain actions for contract and for conversion by Bunge against Manufacturers, unless Manufacturers’ subsequent possession be found authorized or lawful.
A cashier’s check is the primary obligation of the bank which issues it and constitutes its written promise to pay upon demand. It has been described as “ a bill of exchange drawn by a bank upon itself, accepted in advance by the very act of issuance ” (Matter of Bank of U. S., 243 App. Div. 287, 291; Garden Check Cashing Serv. v. First Nat. City Bank, 25 A D 2d 137, affd. 18 N Y 2d 941). As the primary obligation of the bank which issues it, embodying the bank’s written promise to pay upon demand, it is a negotiable instrument presumed to have been issued for value (Negotiable Instruments Law, §§ 20, 50). That *835 presumption cannot be overcome by evidence that the bank which drew the checks received no consideration therefor from the payee. Such proof is irrelevant. It provides no defense (Bobrick v. Second Nat. Bank of Hoboken, 175 App. Div. 550, affd. 224 N. Y. 637). Moreover, defendant did receive consideration for its issuance of the checks by debiting Bergen’s account as authorized by Bergen. That Manufacturers subsequently chose to reverse its entries is irrelevant, in the face of the delivery of the checks to Bunge. The checks having been issued and delivered to the payee, the transaction was a completed one so far as Bunge, the payee, was concerned. Bunge’s rights could not be affected either by the failure of Manufacturers to charge the checks against Bergen’s account or its subsequent reversal of the charges. Once the checks had been delivered, it was beyond the power of Allied, Bergen, or Manufacturers to stop them. They had become the primary obligations of Manufacturers. (Bobrick v. Second Nat. Bank of Hoboken, supra.) Manufacturers became primarily liable to Bunge upon delivery of the checks to Bunge, unless some act of Bunge relieved or precluded such liability.
Special Term has previously ruled that causes of action for conversion were stated. (Schweitzer, J„, N. Y. L. J., May 13, 1969, p. 16, col. 4.) The facts found proved the conversion. Conversion is established when one who owns and has a right to possession of personal property proves that the property is in the unauthorized possession of another (Pierpoint v. Hoyt, 260 N. Y. 26; McCoy v. American Express Co., 253 N. Y. 477; Casey v. Kastel, 237 N. Y. 305). Defendant misconstrues McCoy v. American Express Co. (supra) which clearly establishes that proof of the right to possession is sufficient. That ease turned on the fact that the goods allegedly converted had never been delivered to the pledgee and that the agreement and documents evidencing its rights never entitled it to possession. Delivery to Bunge clothed it with the right to possession unless lost or surrendered by some act by or chargeable to it.
Nor is it a defense that Manufacturers did not know the checks had been delivered to plaintiff. It is sufficient that defendant have full information relating to its own defect in title and the identity of the true owner prior to the institution of the action. (Employers’ Fire Ins. Co. v. Cotten, 245 N. Y. 102; Wagner Trading Co. v. Battery Park Nat. Bank, 228 N. Y. 37; People’s Trust Co. v. Smith, 215 N. Y. 488; People v. Bank of North Amer., 75 N. Y. 547.) Good faith is not a defense in a conversion action. (Hartford Acc. & Ind. Co. v. Walston & Co., 21 N Y 2d 219, rearg. 22 N Y 2d 672.)
*836 Defendant’s argument that its possession of the three checks clothes it with a legal presumption of ownership (Negotiable Instruments Law, § 98, in effect at the time of these transactions) ignores the undisputed fact that the checks do not bear the indorsement of their payee, Bunge. This is a defect in title, not overcome by the presumption created by section 98 of the Negotiable Instruments Law (City Trust Co. v. Botting, 139 Misc. 684; Meuer v. Phenix Nat. Bank, 87 App. Div. 281). Where an instrument is payable to order and not indorsed, the presumption is that it is the property of the person to whose order it has been made payable. (See Saale v. Interstate Steel Co., 27 A D 2d 1, affd. 19 N Y 2d 933; Soma v. Handrulis, 277 N. Y. 223.) Matter of Williamson (264 App. Div. 615) and Anglo-South Amer. Bank v. National City Bank (161 App. Div. 268, affd. 217 N. Y. 726) relied on by defendant, are not to the contrary. There was no proof of delivery in either case.
Negotiation requires delivery and, where the instrument is payable to order, indorsement. (Goshen Nat. Bank v. Bingham, 118 N. Y. 349.) On no version of the facts can it be argued seriously that the checks were negotiated to Manufacturers, clothing it with any presumption of ownership. Moreover, its own explanation of its possession negates any such presumption. That Allied’s messenger returned the checks and Manufacturers accepted them in reliance on the advice of Bergen’s cashier palpably does not amount to negotiation. Accordingly defendant’s possession raises no presumption and provides no basis for the application of the principles laid down in the cases relied on by it. (McNeill v. Shellito, 185 App. Div.. 857; Young v. Alexander, 29 F. 2d 555; Dugan v. United States, 3 Wheat. [16 U. S.] 172; Doniger v. Lasoff, 125 Misc. 838.) In each such case the holder was either the payee or an indorsee to whom the instrument had been delivered for value. The fact that the instrument bore the indorsement of the holder did not preclude recovery by him, because his possession coupled with a chain of title to him found from the body of the instrument itself raised a presumption of title, not negated by his indorsement of the instrument while still in his possession. Here the instruments were delivered to Bunge, the named payee, and are now in the possession of Manufacturers without Bunge’s indorsement, a fatal defect in Manufacturers’ title, not overcome by the presumption relied on in the cited cases.
Equally misplaced is Manufacturers’ reliance on Corporation Holding Co. v. Wieber (230 App. Div. 636), ruling, in accord with the Negotiable Instruments Law, that if the holder of a negotiable instrument transfers it for value without indorsing it, *837 the transferee is vested with such title as the transferor had and may recover on the instrument without the indorsement. Defendant’s difficulty here is the absence of proof that Bunge transferred the checks to defendant or anyone else for value.
No New York case has been found or cited which supports the dictum in Buehler v. Galt (35 Ill. App. 225, 229), heavily relied on by Manufacturers: ‘1 that the possession of a check by the drawer raises a presumption that it has not been delivered to the payee, and that unless notice of a different state of facts is brought home to the banker upon whom the check is drawn, he has a right to act upon that presumption and cancel the check on the application of the drawer.” It is noteworthy that the Illinois court found as a fact that there had been no delivery to the payee, ‘ ‘ who never had title to the check ’ ’, whereas here delivery to Bunge was proved. There are no New York authorities directly in point. The Illinois dictum is contrary to the trend of decisions in New York supporting the rights of bona fide holders of negotiable instruments, even indicating that a payee-holder may be a holder in due course (Saale v. Interstate Steel Co., 27 A D 2d 1, afifd. 19 N Y 2d 933, supra).
Moreover in the Illinois case, a certified check in the possession of the drawer was involved. Ours are cashier’s checks drawn by the bank, returned to the bank by one not a party to the instrument.
In the light of the rationale of the New York conversion cases that lack of knowledge and good faith are not defenses, it cannot be ruled that a payee-holder is precluded from recovery because the issuing bank relied solely on the representations of its customer in accepting return of the checks. (People’s Trust Co. v. Smith, 215 N. Y. 488, supra; Wagner Trading Co. v. Battery Park Nat. Bank, 228 N. Y. 37, supra; People v. Bank of North Amer., 75 N. Y. 547, supra; see Hartford Acc. & Ind. Co. v. Walston & Co., 21 N Y 2d 219, rearg. 22 N Y 2d 672, supra.) Nothing in the Negotiable Instruments Law requires such a ruling. Moreover, even if the Illinois dictum be adopted, the number of checks in close sequence, some on the same days, warranted a more sophisticated inquiry than the mere reliance by Manufacturers on the bald instructions of Bergen’s cashier and the noncommittal actions of Allied’s messenger. The pattern demanded inquiry, but there was none of any significance.
Plaintiff is entitled to recover on its causes of action on contract and in conversion unless it authorized the return of the checks to Manufacturers or is chargeable with the means by which such return was accomplished.
*838 To demonstrate how the checks came into the possession of Clarkin, the Allied messenger who returned them to Manufacturers after their delivery to Bunge, plaintiff offered, and there was received in evidence over objection a statement signed and sworn to by Bunge’s cashier, James Caterina, on November 19, 1963. The court adheres to its ruling that the statement was admissible, relevant and probative, under the rule recently laid down by the Court of Appeals (People v. Brown, 26 N Y 2d 88). Brown modernizes New York’s rule as to the admissibility of declarations against interest to provide that (p. 94): “ an admission against penal interest will be received where material and where the person making the admission is dead, beyond the jurisdiction and thus not available; or where he is in court and refuses to testify as to the fact of the admission on the ground of self incrimination. ’ ’
Caterina’s statement meets these tests. It was amply proved that (1) Caterina is now in Florida, where he has resided for some time; (2) he has ignored efforts to have him come to New York to testify; and (3) in a deposition in this very action he invoked his constitutional privilege under the Fifth Amendment and refused to testify, following a procedure adopted by him in other proceedings. This meets the Brown test of unavailability (p. 93): “ But whether the person is dead, or beyond the jurisdiction, or will not testify, and cannot be compelled to testify because of a constitutional privilege, all equally spell out unavailability of trial testimony.” (Emphasis supplied.)
Caterina’s absence in Florida, and his invocation of the Fifth Amendment, warrant finding he was unavailable. Nothing in Brown supports defendant’s contention that a person must he in a foreign country before it may be ruled he is beyond the jurisdiction.
The statement was against both Caterina’s penal and pecuniary interest. Caterina admitted that: .(1) at the request of Clarkin of Allied he delayed the deposit of Allied checks ‘ ‘ from time to time ’ ’ which ‘1 averaged between $2 and $5 million ’ ’ and which if deposited ‘1 would bounce. There was about $2,300,000 of undeposited checks outstanding for about a month and a half.”; and (2) he falsified Bunge’s records to cover his actions. Directly relevant to this action is the admission: “ In addition to delaying the depositing of checks from time to time, on several occasions, Mr. Clarkin would switch checks with me at the cashier’s window or in the men’s room. He would call from the Oil Department to arrange the switch which consisted of handing me checks drawn on Allied’s regular checking account in place of Cashier’s checks issued by a New York hank *839 which Bunge had just received from Allied. * * * The reason that Cashier’s check [sic] were taken back by Allied is because they wanted another two days’ clearing.”
The statement admits the receipt by Caterina from Clarkin of small amounts of money and whiskey. Thus it confesses to conversion, larceny, falsifying business records and receiving commercial bribes, all against Caterina’s pecuniary and penal interest, which he well knew, as is palpable from the form and language of the statement. Proof of his awareness may also be found in the portion of the statement acknowledging advice, “ that anything I might say may be used against me.” (See Ellwanger v. Whiteford, 15 A D 2d 898, affd. 12 N Y 2d 1037.)
It is not a ground for excluding the statement that it was given to plaintiff’s attorneys within a few days after Caterina’s employment by plaintiff terminated. At that time the interests of plaintiff and its attorneys were clearly adverse to those of Caterina. Not even the benefit of continued employment was available to him. His statement put him in a position where he could be prosecuted. The attorneys could not insure him against such prosecution. Even assuming, as defendant contends, that the statement might put plaintiff in a position to recover against its fidelity insurer, and that this was made known to Caterina, this could in no way inure to his benefit. The fidelity insurer might make a complaint to the appropriate authorities which could have resulted in a prosecution. Moreover, either the plaintiff or the fidelity insurer could have brought an action against him. Whether such an action would be successful is not determinative. The statement was against both his penal and pecuniary interest. Nothing in Brown (supra) provides a basis for defendant’s argument that such a statement is not admissible unless it was given to him who seeks to block its admission. See Letendre v. Hartford Acc. & Ind. Co. (21 N Y 2d 518) as to the bearing on admissibility of the time when and the person to whom the statement was given. These elements go to weight not admissibility.
Nor is the statement inadmissible because it does not refer specifically to the checks in suit. The quoted paragraph and other parts of the statement provide a sufficient basis for an inference that the checks in suit were among those included in the “switch”. Although it may well be that, if he testified on trial, more explicit testimony could have been obtained, this factor also goes to weight and not to admissibility.
Manufacturers further argues that, on the issue of his unavailability, the court may not consider the fact that Caterina *840 invoked the privilege against self incrimination on his deposition, because at the time of the trial the Statute of Limitations had run against any possible prosecution of Caterina. Under the circumstances of this case, Caterina not being before the court and not being amenable to its process, it is unnecessary to engage in nice computations as to whether the privilege could properly be invoked on the trial because of the lapse of time. Although perhaps not relevant, it is noted that defendant made no effort to obtain the deposition of Caterina, after the time which it says had elapsed during which Caterina might have invoked the privilege.
The court also received in evidence, over objection by plaintiff, the testimony of Clark Cummings (Cummings), a member of the firm of attorneys representing the defendant, who testified at some length that in interviews with him, Caterina told Cummings that his prior sworn statement was ‘ ‘ untrue ’ ’ and “ had been forced out of him.” Caterina did not sign a statement or affidavit to such effect for Cummings. Cummings’ testimony was as to conversations he had with Caterina at the time when plaintiff’s motion for summary judgment was pending. The court adheres to its ruling that the testimony was admissible. Where an extrajudicial statement of an unavailable witness is received under an exception to the hearsay rule, a subsequent contradictory extrajudicial statement of the declarant is admissible for impeachment purposes. (People v. Conde, 16 A D 2d 327, affd. 13 N Y 2d 939; People v. Ricken, 242 App. Div. 106; Martorella v. Prudential Ins. Co., 238 App. Div. 532.) It is concluded that Caterina’s statement to Cummings was not the truth. It was made at a time when Caterina might have been subject to prosecution or an action for damages. At that juncture he had every motive to deny the truth of the sworn statement he had made immediately after the events had occurred. It is noted that defendant’s attorneys chose not to disclose Caterina’s conversations with Cummings to the Special Term Justice, in opposing plaintiff’s motion for summary judgment and indeed did not make their existence known until Cummings testified upon the trial some time after the argument on the admissibility of Caterina’s statement. That this was properly a matter of litigation and trial tactics is no basis for finding that the statements to Cummings represented the truth. Nor does it provide a basis for excluding Caterina’s sworn statement.
The court finds that Caterina was the conduit through whom Clarkin wrongfully obtained possession of the three checks in *841 suit, putting Clarkin in a position to return them to Manufacturers, without lawful authority from Bunge. Defendant’s contention that, by reason of Caterina’s position and previous practices, he had authority to engage in the check switching, is without merit. The evidence clearly established that he had no such authority, either by reason of his title or his previous activities. His instructions were to deposit the cashier’s checks, not to switch them. Authority to switch these checks cannot be spelled out from the fact that Caterina had previously been authorized to withhold Allied’s ordinary checks from deposit pursuant to a payment schedule or to deliver Bunge checks which were to be certified in exchange for Allied ordinary checks, the deposit of which was to be delayed. The financial considerations involved in surrendering cashier’s checks in exchange for ordinary checks were of such magnitude as would surely require clear and explicit authority from those in a position to give it. There is not a shred of evidence to establish such authority, actual or implied. Caterina had no such authority. Here, as elsewhere, Manufacturers’ argument overreaches itself. If Caterina was a decision maker, and he and the responsible officials of Bunge knew of Allied’s precarious financial condition, there surely would have been serious consideration and consultation and a considered determination to embark upon a scheme which Avould divest Bunge of cashier’s checks in exchange for Allied’s ordinary checks. The proof is all to the contrary. As has been noted, the charade and quick-switch would have been a pointless exercise, if there was authority to accept ordinary Allied checks for the registered warehouse receipts.
The evidence further established that the Allied ordinary checks which Caterina received from Clarkin, were never paid. There is no merit to Manufacturers’ argument that Caterina’s receipt and subsequent deposit of the Allied ordinary checks amounted to payment to Bunge. His acceptance of the checks in exchange for the cashier’s checks was unauthorized and unlawful. His subsequent deposit of the checks did not establish knowledge, acquiescence or ratification by Bunge. Cdmously, had the ordinary checks been paid by the bank on which draAvn, that would have been the end of the matter. However, this would not have changed the character of the prior acts. Thus, it is immaterial whether the other Allied ordinary checks similarly obtained and handled by Caterina were paid or not paid.
*842 Caterina’s unlawful actions are not chargeable against Bunge. There is no proof that plaintiff had knowledge of the actions of Caterina or the other two employees who might have been involved with him in altering Bunge’s records to cover Caterina’s actions. To the extent that the record established such knowledge by other employees, it was knowledge of Bunge personnel participating in or covering a scheme to defraud plaintiff. This is insufficient to prove knowledge, acquiescence or ratification by Bunge. Although a corporation is ordinarily chargeable with knowledge contained in its own records, this principle is of no avail to Manufacturers. An employer 1 ‘ is not chargeable with knowledge possessed by an employee while stealing its property or acting otherwise in hostility to its interests ”. (Hartford Acc. & Ind. Co. v. Walston & Co., 21 N Y 2d 219, 225, supra.) There was no actual knowledge by Bunge’s responsible officers and officials. In the absence of such knowledge there could be no acquiescence or ratification. Ratification requires intent based on knowledge. (Soma v. Handrulis, 277 N. Y. 223; Merritt v. Bissell, 155 N. Y. 396; Smith v. Kidd, 68 N. Y. 130.)
Manufacturers’ affirmative defenses and argument, that plaintiff failed to exercise ‘ ‘ due care ” or “ reasonable care ’ ’ and was negligent, have been held insufficient by the Appellate Division in this action. (28 A D 2d 842; accord Rosenthal v. Manufacturers Hanover Trust Co., 30 A D 2d 650.) Defendant now argues that the Appellate Division was misled by plaintiff’s recital of the facts in the motion papers, upon which the Appellate Division based its determination. There is no evidence to support the conclusion that the Appellate Division was misled. It is noteworthy that in Rosenthal (supra) citing its decision in this case, the Appellate Division again held negligence not to be a defense.
As it did on the trial, Manufacturers is now seeking to circumvent the orders of the Appellate Division and of this court in this respect by its argument that negligence was established by the evidence introduced under the guise of proving knowledge. However, just as knowledge was not proved, so negligence was not demonstrated. Moreover, even if it be assumed, contrary to the evidence, that Bunge was negligent in failing properly to supervise Caterina or promptly to discover and stop the check switching, such negligence would not inure to the benefit of Manufacturers. As Rosenthal (supra) indicates, Manufacturers’ reliance on the dissent in the Appellate Division, on the appeal from the motion for summary judgment *843 here, is misplaced. Moreover the evidence did not establish Bunge’s knowledge of Caterina’s “ corrupt conduct”, and its inaction in the face of such knowledge amounting to negligence which was the proximate cause of the loss because of the breach of a “ duty to the defendant in the circumstances ”. (28 A D 2d 842, 843.)
The proximate cause of the loss was Caterina’s corrupt conduct coupled with defendant’s complete reliance on its customer Bergen, acting on behalf of Allied. Negligence is actionable or provides a defense only where there is a breach of a duty owed to one who seeks to rely on it. Bunge owed no duty to Manufacturers unless it had timely knowledge of Caterina’s wrongdoing, not shown. In this respect Manufacturers’ position was similar to that of any purchaser of personal property who takes the risk that his title will be no good if his vendor is a thief or has acquired possession from or through a thief. The thief cannot pass good title. The true owner is entitled to recover even if negligent in the care of his property. (People v. Bank of North Amer., 75 N. Y. 547, supra; People’s Trust Co. v. Smith, 215 N. Y. 488, supra.)
Nothing in the Negotiable Instruments Law, the law merchant, or the rules applicable to the transfer of stocks and bonds, is to the contrary. In order to facilitate the transfer of such commercial paper and similar instruments, the law recognizes that one who clothes another with the indicia of ownership of such an instrument is precluded from challenging the title of an innocent purchaser of the instrument in reliance thereon. Thus, an instrument negotiable in form in the hands of its bearer may pass good title, if payable to bearer or indorsed in blank, although the bearer or his predecessor in possession be a thief. This is the rationale of National Safe Deposit Co. v. Hibbs (229 U. S. 391 — instruments in possession of a bank) and Kittredge v. Grannis (236 N. Y. 375 — instruments in possession of a broker), and similar cases heavily relied on by Manufacturers. In both Bibbs and Kittredge the instruments were indorsed in blank by the true owner. Because the true owner had put them in the hands of another in negotiable form, he was estopped to assert a claim against a purchaser in good faith without notice. Not so here, where, although the cashier’s checks were negotiable in form, they were not indorsed by Bunge, the payee to whose order they were drawn. That indorsement was essential to constitute the return of the cashier’s checks to Manufacturers the delivery requisite for *844 negotiation. (Goshen Nat. Bank v. Bingham, 118 N. Y. 349, supra.)
The other cases relied on by Manufacturers are not to the contrary. In each case the corrupt employee was an officer with express or implied authority or was held out to the public as one who had authority to act so that there was a right to rely on his apparent authority. (Hanover Nat. Bank v. American Dock & Trust Co., 148 N. Y. 612; Fifth Nat. Bank v. Navassa Phosphate Co., 119 N. Y. 256; see, also, Salen v. Bank of State of N. Y., 110 App. Div. 636; Cluett v. Couture, 140 App. Div. 830, affd. 206 N. Y. 668; Empire Trust Co. v. Cahan, 274 U. S. 473, cited by the parties, and analyzing the same principles.) As has been stated, Caterina had no actual or implied authority. Manufacturers cannot rely on apparent authority because it neither knew nor dealt with Caterina and never relied on him. It relied solely on its customer.
Manufacturers’ reliance on the “fictitious payee” rule is also misplaced. Bunge was not a fictitious entity. It was the named payee to whom delivery was made, and whose employees received the cashier’s checks as payment received by Bunge from Allied. Bunge was the payee intended by the maker, Manufacturers, and its customer, Bergen, on whose instructions Manufacturers acted. Moreover, Bergen must have acted on Allied’s instructions in designating the payee. The checks were delivered to Bunge by Allied’s messenger. Allied intended Bunge to be the payee. That Allied had a corrupt plan to recover the checks after delivery does not call for the invocation of the “ fictitious payee ” rule. In Hall v. Bank of Blasdell (306 N. Y. 336) relied on by Manufacturers, there was no delivery to the fictitious indorsee. (See Hartford Acc. & Ind. Co. v. Walston & Co., supra.)
Equally insufficient is the defense that Bunge is barred because the transactions concerning these checks were part and parcel of an alleged continuing series of illegal, fictitious and fraudulent transactions and schemes in which Allied and Bunge were involved as part of the 1 ‘ salad oil swindle ’ ’ or conspiracy. The evidence does not support any such conclusion. Although defendant was given every opportunity to plead and prove this defense, it utterly failed to do so. On the opening of trial, after five years of litigation, it was permitted to amend its answer for a third time, to plead such defense in expanded form. It was permitted, over objection, to conduct what may be described fairly as an extensive pretrial discovery proceeding as part of the trial by means of witnesses, depositions and a myriad of *845 documents in its attempt to establish such defense. The court is unable to find any such illegality in the transactions between Allied and Bunge as should bar plaintiff’s recovery in this action. Although some of their transactions may neither be commendable nor thought to be in the public interest, there is no clear proof of illegality. Even if illegality were to be found with respect to some other transactions, it has not been shown that any illegality infected or related to the three checks subject of this litigation or to the transactions underlying their issuance. It is found that these transactions were not proven to be illegal. Although the courts will close their doors to a plaintiff who sues to enforce an illegal bargain, it must be shown that the cause of action arises out of or in connection with the illegality asserted. (Seagirt Realty Corp. v. Chazanof, 13 N Y 2d 282; Southwestern Shipping Corp. v. National City Bank of N. Y., 6 N Y 2d 454; Kelly v. Kosuga, 358 U. S. 516; Tenna Corp. v. Rego Radio & Electronics Corp., 270 F. Supp. 31.) The defense of illegality was not proved.
The final argument of Manufacturers, its “two innocents ” defense, on the basis of alleged “good sense” and “sound policy ”, is merely an attempt to restate its negligence-estoppel defense, without additional basis. As has been noted, the “ two innocents ” defense will preclude recovery by the rightful owner only where the instrument is in negotiable form in the hands of the bearer (National Safe Deposit Co. v. Hibbs, 229 U. S. 391, supra), or where the possessor, indorser or signer of the instrument has actual or implied authority or there is a basis for finding apparent authority (see Hanover Nat. Bank v. American Dock & Trust Co., supra; Fifth Nat. Bank v. Navassa Phosphate Co., supra; Salen v. Bank of State of N. Y., supra; Cluett v. Couture, supra; Empire Trust Co. v. Cohan, supra).
Defendant’s officers’ testimony clearly established that Manufacturers relied solely and wholly on the instructions of its customer, Bergen. Manufacturers’ own expert, Mr. G. Bussel Clark, former New York Superintendent of Banks, testified that it was good banldng practice to follow the customer’s wishes. It does not affront “good sense” and “sound policy” to require the defendant bank to look for recourse to its customer, upon whom it relied. Manufacturers, like other banks, is in complete control of its relations with its customers. (Wagner Trading Co. v. Battery Park Nat. Bank, 228 N. Y. 37, 41-42.) A contrary conclusion is not required because of the fact that cashier’s checks are regularly used for bid contracts and in connection with real estate closings, and are returned for can *846 cellation when the transaction is not consummated. In such instances, the bank obviously must rely on its customer. This is a risk inherent in the hanking business. It is not without significance that Manufacturers did not know or deal directly with Allied and had an indemnity agreement from Bergen, with whom it dealt in this curious manner.
Defendant’s counterclaim based upon plaintiff’s alleged negligence is without support in the record. The negligence relied on is insufficient either as a defense or as a basis for a counterclaim, as held by the Appellate Division and as found after trial.
Plaintiff is entitled to judgment against defendant in the sum of $3,040,386.60, together with appropriate interest on $1,149,964.80 and $1,289,221.80 from November 1, 1963, and on $601,200 from November 13,1963. The counterclaim is dismissed.
All motions not herein disposed of are now denied.